UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DORENE WASHINGTON,                              :

                                                :

               Plaintiff,                               OPINION AND ORDER
                                                :
               -v.-                                     12 Civ. 9448 (GWG)
                                                :

CAROLYN W. COLVIN,                              :
Acting Commissioner of Social Security,[1]
                                                :
               Defendant.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiff Dorene Washington brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security denying her claim for Social

Security Disability benefits under the Social Security Act.  Both Washington and the Acting

Commissioner of Social Security (the "Commissioner") have moved for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons stated below, Washington's motion

is granted, the Commissioner's motion is denied, and the case is remanded for further

proceedings.

I.     BACKGROUND

       A.      Washington's Claim for Benefits and Procedural History

       Washington applied for Social Security Disability benefits on April 5, 2010.  See SSA

Administrative Record, filed June 4, 2013 (Docket # 5) ("R."), at 110-17.  She claimed that her

--------------------------------------------------

       [1] The original caption of this case named Michael J. Astrue as the defendant.  Since that
time, Carolyn W. Colvin became the acting Commissioner of Social Security.  Carolyn W.
Colvin is therefore automatically substituted as the defendant in this suit.  See Fed. R. Civ. P.
25(d); 42 U.S.C. § 405(g). The Clerk is requested to so amend the caption.

ability to work was limited by "Sarcoidosis, Bi-Polar, Manic Depression, left knee pain, Sialoadenitis, Hypercholsesterolemia [sic], [and] High blood pressure." R. 138. She alleged that this disability began on April 30, 2009, when she was 53 years old. R. 110. Washington has a high school education. R. 41. She worked as a child care provider for several years, until 2008 or 2009. Id.

On May 27, 2010, the Social Security Administration denied Washington's application for Social Security Disability benefits. R. 66-69. Washington then requested a hearing before an Administrative Law Judge ("ALJ"), R. 70-71, which was held on November 8, 2011, R. 36-64. On November 25, 2011, the ALJ issued a decision finding that Washington was not disabled. R. 20-32. The Appeals Council denied Washington's request for review on November 13, 2012, R. 1-7, making the ALJ's decision the final decision of the Commissioner. On December 28, 2012, Washington filed this suit under 42 U.S.C. § 405(g). See Complaint, filed Dec. 28, 2012 (Docket # 1). Both parties subsequently filed motions for judgment on the pleadings.[2] The case was referred to the undersigned on January 26, 2015 (Docket # 15). On March 10, 2015, the parties consented to disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Docket # 17).

B.      The Administrative Record

Washington and the Commissioner have each provided a summary of the relevant medical evidence contained in the administrative record. See Pl. Mem. at 1-10; Comm'r Mem.

---

[2] See Motion for Judgment on the Pleadings, filed July 26, 2013 (Docket # 6); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed July 26, 2013 (Docket # 7) ("Pl. Mem."); Notice of Motion, filed Dec. 12, 2013 (Docket # 12); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Dec. 12, 2013 (Docket # 13) ("Comm'r Mem.").

at 4-14.  The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit.  We discuss the portions of the record pertinent to the adjudication of this case in section III below.

      C.      <u>The Hearing Before the ALJ</u>

      A hearing before ALJ Kenneth G. Levin was held on November 8, 2011.  R. 36-64. Washington appeared in person and was represented by an attorney.  R. 38.  Washington testified that she traveled to the hearing by train and that she usually takes a train or bus when she travels, R. 40, but that she usually does not travel alone "[b]ecause of [her] knee, and because [she] get[s] paranoid," R. 51.  The ALJ heard testimony from four individuals: Washington, medical expert Dr. Charles Platz,[3] psychological expert Dr. Brady Dalton, and vocational expert Miriam Green.[4]  R. 23, 37.

      Washington testified first, responding to questions from the ALJ and then her attorney. She indicated that she was 56 years old, five feet two inches tall, and weighed 190 pounds, though she stated that this was not close to her usual weight because she used to weigh 233 pounds but was on a diet.  R. 39.  Washington stated that she lived with her 17-year-old daughter.  R. 39-40.  She stated that she had a twelfth-grade education and that the last time she worked was in 2008 or 2009.  R. 41.  At that time, she was working as a child care provider at a nursery at Trinity Christian Academy.  <u>Id.</u>  Her hours at that job were from 6:30 a.m. to 4:30 p.m.  <u>Id.</u>  Her duties consisted of caring for children between the ages of six weeks and 12

---

    [3]  The doctor is referred to as "Platz" in the hearing transcript, but "Plotz" in the ALJ's decision and in the parties' memoranda of law.

    [4]  Ms. Green is referred to as "Green" in the hearing transcript, but "Greene" in the ALJ's decision and the Commissioner's memorandum of law.

months, including changing diapers, playing with the infants, and feeding and clothing them.  R. 42.  Prior to this job, she had worked at a similar job in Florida for some time, see id., and prior to that, from approximately 2003 until 2006, she provided child care from her home to six children of various ages, see R. 42-43.

Asked about her current symptoms that she believed would interfere with her ability to work, Washington testified that she experienced mood swings, depression, and crying, and that these symptoms had been "quite bad" for approximately three-and-a-half or four years and caused her to sometimes be "afraid to even come outside of [her] apartment."  R. 43.  However, she stated that she was taking Lithium, which helped her but did not completely eliminate her symptoms. R. 43, 52.  She testified that she had other, non-psychiatric symptoms, including sarcoidosis, which caused her to feel pressure on her chest so she "can't walk or . . . breathe."  R. 44.  She was not taking any medication for the sarcoidosis.  See R. 44-45.  She also testified that her "bones bother [her] a lot," particularly her left knee.  R. 45.  She had previously gone to a specialist, who drained the fluid from that knee.  Id.  When the ALJ recited a list of medications, including Lithium, Mirtazapine, setterzine, Zolpidem, Advil, aspirin, hypertension medication, and multivitamins, Washington indicated that she took all or most of them.  See R. 44-45.

Washington testified that she could now walk "two blocks without stopping," whereas before she "could only walk not even a whole block."  R. 46.  After two blocks, however, her chest would "bother[]" her and her knee would "act[] up."  Id.  She could stand for "[a]bout a[n] hour and a half to two hours," and there was no limit to her ability to sit.  Id.  She could lift her pocketbook, but not groceries or heavy bags.  Id.  She was able to do some household chores with the help of her daughter and son, including sitting on the bed to fold laundry and putting it away after someone else took the clothes out of the washing machine for her.  R. 47.

4

Washington stated that she ordinarily spent her days "[l]ying in bed, sometime[s] reading the Bible," watching the news and gospel stations on television, and going to doctor's appointments. R. 47, 52-53.  Additionally, she attended church two or three times per month and had gone to Bible class for two hours each Monday until a month prior to the hearing, when she stopped attending because she "couldn't really stay up" for the class.  R. 48.  Until four months before the hearing, Washington volunteered occasionally at her daughter's dance school, helping the dancers with their costumes and cleaning up after them.  R. 49-50.  She stated that she tried to go to the gym "at least twice a week" — where she would "sit down on the bike" and "do the bike" — for 35 to 40 minutes "because it helps [her] knee."  R. 50, 52.  Washington socialized with a neighbor who came to check in on her, and she spoke with her siblings on the telephone.  R. 48.  Additionally, she had hosted a family function for Christmas that year and had cooked Thanksgiving dinner with her family.  R. 50-51.

Next, Dr. Platz, the medical expert, testified.  Responding to questions from the ALJ, he stated that he had listened to Washington's testimony and reviewed her records.  R. 53.  Dr. Platz stated that Washington's medically determinable physical impairments consisted of "a history of Sarcoid for over 20 years, which has not given her any significant difficulty;" "a history of pain in the left knee for over 10 years," though an x-ray of the knee showed that it was within normal limits; "mild hypertension" that was "well-controlled;" obesity; a prior operation on one or both feet for hammer toe and bunionectomy, "from which she has recovered;" and a "history of recent cocaine, marijuana, and alcohol use."  R. 53-54.  Upon questioning from Washington's attorney, Dr. Platz clarified that the most recent drug use was in either April or May 2010, but he agreed with the ALJ that Washington's drug use was "not an issue" in the case.  R. 55.  When the ALJ asked if Washington had a medically determinable impairment that would reasonably be

expected to limit her functioning for a period of 12 continuous months, Dr. Platz stated that the "[s]hort answer is no." R. 54.  Washington's attorney asked Dr. Platz about erythema nodosum, which Dr. Platz described as "a skin condition associated sometimes with Sarcoid," which "in of itself is of no great significance" and causes "practically no[]" symptoms. R. 55-56.  In response to the attorney's questions, Dr. Platz confirmed that the condition may be associated with fever, but he emphasized that it "can be associated with almost anything" and that "Sarcoidosis is a many, many faced disease." R. 56.

Dr. Dalton, the psychological expert, testified next.  He stated he had reviewed Washington's records and listened to the testimony presented during the hearing. R. 57.  In response to the ALJ's questions, Dr. Dalton testified that Washington's medically determinable mental impairments consisted of "a clear . . . history of bi-polar disorder" "dating way back" and a "history of substance abuse," though there was no evidence that Washington had used drugs from late 2010 until the date of the hearing. R. 57-58.  He also noted that he had observed "a suggestion of PTSD" "at some point," which led him to list that "as a rule out, something to consider," but he did not "see it go any further." R. 57.  Dr. Dalton testified that Washington had "a lengthy history of pharmacotherapy, meaning medications" for her bipolar disorder — the most often prescribed medication being Lithium. R. 58.  He noted that the medication had "some benefit in decreasing the symptoms . . . in intensity and frequency," though it had not completely resolved them. Id.  He also stated that Washington had "a history of psychotherapy." Id.

Dr. Dalton testified that Washington had some limitations in her activities of daily living, such as cooking and cleaning, but given her ability to attend church, maintain relationships with her family, and use transportation, those limitations were only moderate. Id.  She was also

6

moderately limited in her social functioning, despite experiencing "paranoia around the general public."  Id.  Finally, as to consistence, persistence, concentration, and pace, Dr. Dalton stated that Washington's limitations were "no more than moderate."  R. 58-59.  The ALJ asked about a new report — presumably referring to the narrative report from Dr. Paul Pierre-Antoine dated November 3, 2011, see R. 449-50 — which stated that Washington was considerably more limited than Dr. Dalton had testified, to which Dr. Dalton responded that he did not believe the report was supported by Washington's records.  See R. 59-60.  This was because the new report contradicted treatment notes from the same provider from March 30, 2010 through August 5, 2011, which consistently reported that Washington was "psychiatrically stable."  Id.  Dr. Dalton quoted several portions of the notes to support this opinion.  See R. 60.  As to Washington's residual functional capacity and ability to perform work-related activities, Dr. Dalton opined that "[l]ooking at all of this collectively . . . a person would be capable of simple work . . . in low stress settings," with "low social contact."  Id.

Finally, Ms. Green, the vocational expert, testified.  She stated that Washington's past relevant work was as a babysitter, which was a "medium exertional level" job.  R. 61.  She indicated that a person who is limited to low-stress tasks involving low levels of social contact would not be able to do that job.  Id.  The ALJ asked Ms. Green to assume a hypothetical person of Washington's age, education, and prior work experience, who was limited to simple, routine, low-stress work tasks involving low levels of interaction with people.  R. 61.  He inquired as to what jobs such a person would be able to perform at a "medium level" and a "light level."  Id. Ms. Green responded that, at the medium level, the job of laundry worker (5,000 positions locally and 250,000 nationally) and linen room attendant (4,000 positions locally and 100,000 nationally) would be available.  R. 61-62.  At the medium-to-light level, packer jobs would be

available (10,000 positions for each of light and medium packer jobs locally and approximately 500,000 positions each nationally).  R. 62.  At the light level, the job of retail price marker (3,000 positions locally and 200,000 nationally) or assembly jobs (6,000 positions locally and 1,000,000 nationally) would be available.  Id.

In response to questioning by Washington's attorney, Ms. Green opined that a hypothetical person of Washington's age, education, and experience would be precluded from work if she were unable to maintain punctuality in a customary work setting.  Id.  Additionally, such a hypothetical person would be precluded from the jobs that Ms. Green had listed if that person was "essentially precluded from any contact with co-workers or the general public."  R. 62-63.  In particular, if the person were precluded from contact with co-workers, "then all competitive work would be out of the question."  R. 63.

D.    The ALJ's Decision

On November 25, 2011, the ALJ issued a decision finding that Washington was not disabled.  R. 20-32.  The ALJ found that Washington had not engaged in gainful activity since April 30, 2009, the alleged onset date of her disability.  R. 30.  He further found that from April 30, 2009 through December 31, 2009, Washington had a "'severe' combination of obesity and intermittent left knee complaints," and that since January 1, 2010 she had "a bipolar affective disorder" in addition to those conditions.  Id.  However, he found that Washington's impairments did not "meet[] or medically equal[] the requirements of any impairment listed in Appendix 1, Subpart P of Regulations No. 4."  Id.  According to the ALJ, between April 30, 2009 and December 31, 2009, Washington was "able to perform the full range of medium work as defined at 20 CFR 404.1567(c)."  Id.  From January 1, 2010, Washington was "able to perform the exertional requirements of medium work" but was "limited to simple, low stress tasks involving

8

low levels of social interaction." R. 31.  Given this, the ALJ found that Washington was able to perform her past relevant work as a babysitter until December 31, 2009, and that after that time, she was able to perform other jobs that existed in significant numbers in the national economy. Id.

The ALJ's decision gave an extensive recitation of the hearing testimony and medical evidence.  He summarized Washington's own testimony about her symptoms and activities, see R. 25-26, finding that she had generally been "avoidant to questions" and that "some of her admitted activities came out only because [the ALJ] knew to ask about them based on her own records," R. 26.  The ALJ acknowledged that Washington was "somewhat obese," but he noted that "she has been losing weight with diet and exercise." Id.  He noted Washington's hypertension, which he described as "fully controlled with medication," and her podiatric surgeries, from which Washington "had completely recovered." Id.  The ALJ referred to Washington's "long history of sarcoidosis," which had "not prevent[ed] her from working for her entire career." R. 27.  He stated that, in Washington's case, the condition manifested itself almost entirely in the form of "intermittent nodular lesions (known as 'erythema nodosum') on various parts of her body, which are treated symptomatically when they occur." Id.  He referred to Washington's chest pain and shortness of breath but noted that "there is hardly a single mention of" such symptoms in Washington's medical records, "let alone any attribution of such symptoms to her sarcoid disease or any other disease she has under treatment." Id.  Moreover, when Washington had complained of these symptoms, "she has had completely negative findings (including a normal chest x-ray and cardiac testing)." Id.  The ALJ also noted that Washington had "occasional flairs of sialoadenitis (inflammation of her salivary glands)," but she had not considered it significant enough to mention in her testimony at the hearing.  Id.

The ALJ also summarized the results of Washington's May 14, 2010 consultative examination by Aurelio Salon, M.D.  See id.  Dr. Salon had opined that Washington "would have a number of physical restrictions," but that those restrictions "arose only because of her recent foot surgery."  Id.  As to Washington's psychological symptoms, the ALJ stated that Washington had been diagnosed with polysubstance abuse and bipolar disorder and that her records "document fluctuating symptoms, depending on whether she is complying with her prescribed medication or experiencing external (family) stressors."  Id.  Despite those symptoms, Washington was able to remain "relatively socially active — attending church and Bible studies regularly, volunteering at her daughter's dance school, making all the arrangements for her cousin's funeral . . . , starting a relationship with a new boyfriend . . . , etc."  R. 27-28.  The ALJ noted that Washington's psychiatrist, Dr. Pierre-Antoine, had provided two opinions regarding Washington's condition and ability to function: the first of these, dated February 24, 2011, characterized Washington as having "'marked' deficits in attention/concentration, keeping a regular work schedule, working around other people, completing a normal work-week without undue interruptions, and performing even 'low-stress' work tasks;" and the second, dated November 3, 2011, characterized Washington as "markedly symptomatic and markedly limited in several work-related areas."  R. 28.  Additionally, the ALJ discussed the mental status examination Washington had with Michael Alexander, Ph.D. on May 14, 2010.  Id.  The ALJ noted that Washington was walking with a cane at the time of the examination, but he characterized the examination results as "completely unremarkable."  Id.  Dr. Alexander diagnosed Washington with depressive disorder and polysubstance abuse and opined that these conditions "would not significantly interfere with [Washington's] work-related functioning."  Id.  The ALJ further noted that the Disability Determination Services review psychiatrist, Dr.

Altmansberger, concurred.  See id.; see also R. 240 (Psychiatric Review Technique form dated May 21, 2010, checking a box labeled "Impairment(s) Not Severe" under the heading "Medical Disposition(s)").

Referring to the medical expert's testimony at the hearing, the ALJ noted that Dr. Platz had testified that Washington's records demonstrated a decades-long history of sarcoidosis, but he had stated that "it has not been causing any significant symptoms."  Id.  As for Washington's erythema nodosum, Dr. Platz testified that this "is a skin condition of no great significance," and the ALJ noted that Washington did not mention this condition in her testimony.  Id.  The ALJ remarked that, according to Dr. Platz, Washington had a long history of left knee pain, but x-rays of the joint were normal and Washington has "minimal clinical deficits" as a result of this problem.  Id.  Additionally, the ALJ mentioned the findings that Washington has "mild and well-controlled hypertension," a history of polysubstance abuse continuing into 2010, and is obese.  Id.  He noted the doctor's conclusion that "even though [Washington] has several medical conditions, none of them — singly or in combination — would reasonably be expected to limit her ability to function physically, at all, for twelve continuous months."  Id.

The ALJ also discussed the testimony of Dr. Dalton, who testified that Washington had a long history of bipolar disorder, a suggestion of PTSD that was not confirmed, and a history of polysubstance abuse.  Id.  The ALJ noted that Washington had been treated with various medications, most recently Lithium, and that "[t]he medications help her symptoms in part but do not totally relieve them."  Id.  The ALJ noted that Dr. Dalton believed that Dr. Pierre-Antoine's assessment of Washington — that she has "substantial functional deficits" — was not supported by Dr. Pierre-Antoine's own notes, which show Washington to be "overall psychiatrically stable and functional," with her mental status examinations being "usually

11

unremarkable." Id.  According to Dr. Dalton, Washington did not have "any Listings-level

impairment lasting for the required durational period," and she "ought reasonably to be able to

perform simple, low stress work tasks involving no more than occasional social interaction."

R. 28-29.  The ALJ noted that Dr. Dalton's opinion was that Washington's "activities of daily

living are moderately impacted at most, that her social functioning is moderately impacted, that

her concentration/persistence/pace are at most moderately impacted on the entire record, and that

she has experienced no episodes of deterioration or decompensation." R. 29.

    The ALJ found that Washington was not a "particularly credible witness." Id.  This was

because "[s]he did not reveal quite a few activities when asked open-ended questions" and

"tended to discount [the] significance" of activities when reminded of them — as an example,

the ALJ noted that Washington testified that she merely "sat" on the bicycle at the gym, but she

had lost over 40 pounds, partly due to her exercise regimen.  Id.  Moreover, Washington "spoke

of symptoms that are not even documented in her own records, and left out many that are." Id.

Additionally, Washington admitted "that she has no limits on sitting and few on standing" and

that she "socializes with family members and is relatively active in church." Id.

    Notwithstanding his finding that Washington was not a credible witness, the record of her

activities, and Dr. Platz and Dr. Salon's opinions that Washington had no physical restrictions,

the ALJ stated that he was "not sure it is quite fair to rate [Washington] as having no physical

restrictions whatsoever." Id.  He instead assumed that "because of her obesity and her

intermittent left knee complaints of unclear etiology," Washington was "limited to medium

exertional activity." Id.  As to Washington's psychiatric condition, the ALJ noted that her

"diagnosis does appear to be bipolar disorder," and that she "was also an intermittent

polysubstance abuser at least until mid-2010." Id.  Though "[s]he is not as reliable as she should

be about taking her prescribed medication," "she does reasonably well when she does comply."
Id.  The ALJ noted that Washington was raising a teenaged child, was active in church, prepared
meals for her extended family, socialized with family members, acquired a new boyfriend during
the time of alleged disability, traveled alone on the subway to her hearing, and did volunteer
work at her daughter's school until recently.  Id.

The ALJ noted that the testimony of Ms. Green, the vocational expert, confirmed that
after January 1, 2010, Washington's psychiatric condition would prevent her from doing her
prior work as a babysitter.  R. 29-30.  In response to the ALJ's questions about a hypothetical
person of Washington's age, education, and work experience, with her same non-exertional
limitations, Ms. Green had responded that there would be jobs available to such a person in the
national economy in significant numbers at both the medium and light levels.  See R. 30.  The
ALJ determined that the Commissioner's burden of proof was therefore met and that
Washington was not disabled.  Id.

II.   APPLICABLE LAW

A.   Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining
whether the [Commissioner's] conclusions were supported by substantial evidence in the record
and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)
(per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117,
127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) (2012) ("The findings of the Commissioner of
Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . ").
Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord

Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

      "Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (citation and internal quotation marks omitted); see McIntyre v. Colvin, 758 F.3d 146,

149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the

Commissioner's conclusion must be upheld.") (citation omitted).  Thus, "[i]f the reviewing court

finds substantial evidence to support the Commissioner's final decision, that decision must be

upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v.

Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126

(2d Cir. 1990)).  The Second Circuit has characterized the "substantial evidence" standard as "a

very deferential standard of review — even more so than the 'clearly erroneous' standard."

Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation

omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject

those facts only if a reasonable factfinder would have to conclude otherwise."  Id. at 448

(emphasis in original) (citation and internal quotation marks omitted).  "The role of the

reviewing court is therefore quite limited and substantial deference is to be afforded the

Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation

marks omitted).

      B.    Standard Governing Evaluation of Disability Claims by the Agency

      The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1, 404.1520(a)(4) (2014); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the

15

listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.    DISCUSSION

Washington seeks remand or reversal of the ALJ's decision on the grounds that the ALJ failed to apply the "psychiatric review technique," failed to properly weigh the medical evidence, failed to properly evaluate Washington's credibility, and failed to adequately consider Washington's obesity. Pl. Mem. at 12-24. We address each of these claims in turn.

A.    The Psychiatric Review Technique

Washington argues that the ALJ erred in his evaluation of her mental impairments by failing to follow the "special technique" provided by 20 C.F.R. § 404.1520a for evaluating mental impairments. See Pl. Mem. at 17-18. This technique requires, first, that the ALJ evaluate the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [he or she has] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If the claimant is determined to have such impairments, the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the

16

impairment(s) and document [his] findings." Id.  Second, the ALJ must "rate the degree of

functional limitation resulting from the impairment(s)" in four broad areas: "[a]ctivities of daily

living; social functioning; concentration, persistance, or pace; and episodes of decompensation."

Id. §§ 404.1520a(b)(2)(3), (c); accord Kohler v. Astrue, 546 F.3d 260, 266 (2d Cir. 2008).

"[T]he regulations require application of this process to be documented."  Kohler, 546 F.3d at

266 (citing 20 C.F.R. § 404.1520(e)).[5]  Specifically, the ALJ's written decision "must include a

specific finding as to the degree of limitation in each of the functional areas" listed above.  20

C.F.R. § 404.1520a(e)(4).  Where the reviewing court cannot identify the ALJ's findings

regarding the degree of the claimant's limitations in the four functional areas or discern whether

the ALJ properly considered all relevant evidence to those areas, remand is appropriate.  See

Kohler, 546 F.3d at 269; accord Jenkins v. Comm'r of Soc. Sec., 769 F. Supp. 2d 157, 162

(W.D.N.Y. 2011).

Here, the Commissioner essentially concedes that the ALJ did not follow the "special

technique" prescribed by § 404.1520a.  Instead, the Commissioner seems to argue that the ALJ

satisfied that section's requirements because his decision relied upon evidence from Dr. Dalton,

who made specific findings in each of the four functional areas, and it "reflect[ed] consideration

for evidence relating to" those areas.  Comm'r Mem. at 20-21.  We reject this argument.  It

---

[5]  This documentation apparently used to be done in the form of a Psychiatric Review
Technique form, but the regulations no longer require that such a form be completed by the ALJ.
See Kohler, 546 F.3d at 266 (citing Revised Medical Criteria for Evaluating Mental Disorders
and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50748 (Aug. 21, 2000)).  There is evidence that
such a form was completed by Dr. Altmansberger, see R. 240, but the record does not contain all
the pages of that form, and the ALJ's decision only references the one page that is contained in
the record, see R. 28.  That page does not contain any information about the four functional
areas.  See R. 240.  We therefore cannot conclude that this form provides a sufficient basis for
the ALJ's decision.

would be one thing if the ALJ's decision made the appropriate findings without invoking the psychiatric review technique in so many words.  But here, it did not.  While the decision may be read as approving Dr. Dalton's assessment of Washington's limitations, see R. 28-29, the decision does not clearly set forth the "symptoms, signs, and laboratory findings" that substantiate the presence of limitations in each of the four functional areas.

The cases cited by the Commissioner do not require a different result.  In Comins v. Astrue, 374 F. App'x 147 (2d Cir. 2010), the court noted that "the ALJ's decision specifically expounded on each of the four functional areas of the special technique." Id. at 150.  In Arguinzoni v. Astrue, 2009 WL 1765252 (W.D.N.Y. June 22, 2009), the court held that the ALJ's failure to record specific findings in each of the four areas was harmless error, because the ALJ had "highlighted his findings" and cited medical evidence sufficient for the court to determine what his decision would have been had he adhered to the special technique.  See id. at *8-9.  Here, by contrast, we lack any findings by the ALJ that substantiate the limitations found as to each of the four functional areas.  See Jenkins, 769 F. Supp. 2d at 162 ("[T]he Court is not free to engage in speculation concerning what the ALJ might have concluded had the technique been applied in the first instance.").  Accordingly, the case must be remanded for further proceedings.

B.    The ALJ's Weighing of the Medical Evidence

Washington claims that the ALJ "[f]ailed to [p]roperly [w]eigh the [m]edical [e]vidence," Pl. Mem. at 12 — an argument that seems to rest on Washington's contention that the ALJ failed to follow the treating physician rule with respect to the evidence from Dr. Pierre-Antoine and that the ALJ's explanation of Washington's residual functional capacity was lacking.  See Pl. Mem. at 12-17.

18

As for the treating physician rule, Washington argues that the ALJ failed to follow the treating physician rule because he did not "properly account for the opinions provided by [the] treating psychiatrist, Dr. Pierre-Antoine." Pl. Mem. at 14. The Commissioner argues that the ALJ was justified in not giving controlling weight to Dr. Pierre-Antoine's opinions because his opinion was not "well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence of record," including evidence from the consultative examiner and other record evidence. Comm'r Mem. at 23 (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)).

In determining whether a claimant is disabled, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Under this rule, the Commissioner is not required to give deference to the treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (citation omitted). Moreover, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citation omitted).

Where an ALJ does not give controlling weight to the opinion of a treating physician, he must consider other factors in determining what weight to give the available opinions. 20 C.F.R. § 404.1527(c)(2); accord Halloran, 362 F.3d at 32. These factors include: (1) the "[l]ength of the treatment relationship and the frequency of examination," (2) the "[n]ature and extent of the

19

treatment relationship," (3) the evidence and explanations supporting an opinion, (4) the

consistency of the opinion with the record as a whole, and (5) whether the person offering the

opinion is a specialist in the area at issue.  20 C.F.R. § 404.1527(c)(2)-(5).  Additionally, the ALJ

must provide "good reasons" for not affording the treating physician's opinion controlling

weight.  E.g., Halloran, 362 F.3d at 32 (citations omitted); accord 20 C.F.R. § 404.1527(c)(2).

       Here, the ALJ did not mention the treating physician rule or even explain what weight he

afforded each medical opinion.  The ALJ did note that Washington's treating psychiatrist, Dr.

Pierre-Antoine, had provided two reports indicating that Washington was "markedly limited in

several work-related areas."  R. 28; see R. 270-77 (Dr. Pierre-Antoine's

Psychiatric/Psychological Impairment Questionnaire dated February 24, 2011); R. 449-50

(narrative from Dr. Pierre-Antoine dated November 3, 2011); see also R. 469-71 ("Psychiatric

Update" from Dr. Pierre-Antoine dated July 12, 2011, containing a similar opinion, which the

ALJ did not mention).  The ALJ also noted that Dr. Dalton disagreed with Dr. Pierre-Antoine.

See R. 28.  But the ALJ never explicitly stated that he was accepting Dr. Dalton's analysis over

that of Dr. Pierre-Antoine, let alone explain why he was doing so.  In light of the fact that the

case is being remanded, the ALJ should give the "good reasons," if any, why he did not afford

controlling weight to Dr. Pierre-Antoine's opinion.

       As for the determination of residual functional capacity, the remand will create a

different record with respect to any psychological limitations.  Accordingly, we do not feel it

appropriate to address Washington's arguments on this topic in this Opinion and Order.

       As to Washington's physical impairments, the ALJ on remand should express with

greater clarity whether and to what degree he was accepting Dr. Platz and Dr. Salon's evidence

and rejecting Washington's testimony.  The current decision seems to implicitly accept these

doctors' findings — though the ALJ stated that he accepted Washington's testimony regarding her left knee complaints.  See R. 29.  But the decision never explicitly adopts the doctors' findings.  As part of the remand process, the ALJ should also discuss the weight he gives to the evidence about Washington's physical complaints contained in the medical records from Washington's treating physicians, Dr. Patel and Dr. Naarendorp.

      C.      The ALJ's Evaluation of Washington's Credibility

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (construing and citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  According to Washington, the ALJ did not properly evaluate her credibility because he did not cite record evidence that conflicted with Washington's testimony and because his evaluation of Washington's daily activities did not demonstrate her inability to work.  See Pl. Mem. at 20-21.

Once again, the remand will create a different record from that before the Court today. Accordingly, we do not find it necessary to address Washington's contentions on this point.  We do note, however, that there may be one instance in which the ALJ misread the record.  In his decision, the ALJ stated that Washington testified that her visits to the gym consisted of "nothing more than 'sitting' on an exercise bicycle."  R. 29.  This finding appears to be based on the following statement from Washington's testimony: "I sit down on the bike."  R. 50.  But Washington seemed to make clear at the hearing that she did more than just sit on the bike.  See

id. ("I just sit down and bike, and I do the bike"); R. 51 ("I try to do as much as I could.").  It thus appears that the ALJ may have taken Washington's words "sit down on the bike" out of context, a matter that the ALJ may wish to correct on remand.

      D.      The ALJ's Consideration of Washington's Obesity

      Washington argues that the ALJ erred by "fail[ing] to consider the impact that Ms. Washington's obesity had on her residual functional capacity or on her other impairments."  Pl. Mem. at 23.  But "[o]besity is not in and of itself a disability," and courts have held that "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand."  Guadalupe v. Barnhart, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing Titles II and XVI: Evaluation of Obesity, SSR 00–3p, 2000 WL 33952015 (May 15, 2000)) (additional citations omitted).  "An ALJ's final determination can constitute an appropriate consideration of the effects of obesity if it properly weighs evaluations by doctors that have accounted for the claimant's obesity."  Paulino v. Astrue, 2010 WL 3001752, at *18 (S.D.N.Y. July 30, 2010).

      Here, the ALJ's decision adequately addressed Washington's obesity.  The decision summarized record evidence of her obesity, see R. 26-28, and his residual functional capacity assessment mentioned her obesity, see R. 29.  Additionally, the record contained ample evidence from doctors who had accounted for Washington's obesity, see, e.g., R. 169, 172, 175, 178, 181, 183, 185, 189, 191, 193, 196, 199 (notes from Washington's primary physician, Dr. Patel, indicating that Washington was obese and that he strongly encouraged weight loss); R. 54 (testimony from Dr. Platz that Washington was obese), which evidence the ALJ apparently considered in rendering his decision, see R. 26 (the ALJ's decision mentioning Washington's records and testimony with respect to her obesity and weight loss).  Therefore, the ALJ sufficiently considered Washington's obesity, and he need not discuss it further on remand.

IV.    CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the

pleadings (Docket # 12) is denied, and Washington's motion for judgment on the pleadings

(Docket # 6) is granted.  The case is remanded for further proceedings consistent with this

Opinion and Order.  The Clerk is requested to enter judgment.

SO ORDERED.

Dated: March 31, 2015
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

23